UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
MULTI-JUICE, S.A., SNAPPLE HELLAS, S.A.,
and NEW AGE BEVERAGES HELLAS,

                  Plaintiffs,                02 Civ. 4635 (RPP)

        - against -                **OPINION AND ORDER**

SNAPPLE BEVERAGE CORP., and
MISTIC BRANDS, INC.,

                  Defendants.
-------------------------------------------------------------------X
SNAPPLE BEVERAGE CORP., and
MISTIC BRANDS, INC.,

                  Counterclaim Plaintiffs,

        - against -

MULTI-JUICE, S.A., NEW AGE BEVERAGE
HELLAS, ARTHUR TAVANTZIS and
NAOUM TAVANTZIS,

                  Counterclaim Defendants.
-------------------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

      By motion dated September 30, 2005, Defendants/Counterclaim Plaintiffs

Snapple Beverage Corp. ("Snapple") and Mistic Brands, Inc. ("Mistic") ("Defendants")

moved for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil

Procedure ("Fed. R. Civ. P.") to dismiss the First Cause of Action of Plaintiff Multi-

Juice, S.A. ("Multi-Juice") for breach of a distribution agreement between Snapple and

Multi-Juice; dismiss the Fourth Cause of Action for breach by Snapple of the Settlement

Agreement with Snapple Hellas S.A. ("Hellas"); grant Snapple summary judgment on its

First Counterclaim for breach of contract against Multi-Juice and Counterclaim

Defendants Arthur Tavantzis and Naoum Tavantzis ("the Tavantzises"); and grant Snapple summary judgment on its Second Counterclaim for attorneys' fees against Multi-Juice and the Tavantzises. By motion dated October 3, 2005, Plaintiff New Age Beverage Hellas ("New Age") moved pursuant to Fed. R. Civ. P. 56 for summary judgment against Mistic for breach of an exclusive distribution agreement entered into on October 13, 1995.

For the reasons that follow, Plaintiffs' First Cause of Action for breach of the distribution agreement between Snapple and Multi-Juice is dismissed; Plaintiffs' Fourth Cause of Action for breach of the Snapple Hellas Settlement Agreement is dismissed; and summary judgment is granted as to Defendant Snapple's counterclaim against Multi-Juice for goods sold and delivered but denied as to Defendants' motion for summary judgment for breach of contract and attorneys' fees. In addition, Plaintiff New Age's motion for summary judgment against Mistic is denied.

**BACKGROUND**

Plaintiffs commenced this action on June 14, 2002. In the First Cause of Action, Multi-Juice seeks damages for breach of a three- to five-year exclusive beverage distributorship agreement entered into between Snapple and Multi-Juice, a Greek corporation. The alleged exclusive distributorship agreement was entered into subsequent to a settlement in August 1997 of a lawsuit commenced by Snapple Hellas, S.A., a Greek distribution company owned by the Tavantzises, against Snapple and its prior parent corporation, the Quaker Oats Company ("Quaker"). In the Fourth Cause of Action, Plaintiffs seek damages from Snapple for breach of the Hellas Settlement Agreement. By motion dated September 30, 2005, Defendants moved for partial

summary judgment pursuant to Fed. R. Civ. P. Rule 56.  The background to this controversy is set forth in a prior opinion of this Court, <u>Multi-Juice, S.A. v. Snapple Bev. Corp.</u>, No. 02 Civ. 4635 (RPP), 2003 U.S. Dist. LEXIS 7040 (S.D.N.Y. Apr. 24, 2003), familiarity with which is assumed.[1]  By motion dated September 30, 2005, Plaintiff New Age moved for summary judgment pursuant to Fed. R. Civ. P. Rule 56 against Defendant Mistic.

**Standard of Review**

Pursuant to Rule 56 of the Fed. R. Civ. P., a moving party is granted summary judgment when "the pleadings, dispositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The summary judgment standard is "well-settled" in the Second Circuit. <u>Marvel Characters, Inc. v. Simon</u>, 310 F.3d 280, 285 (2d Cir. 2002).  The Second Circuit stated:

> The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists.  In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant . . . Summary judgment is improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party.

<u>Id</u>. at 286 (citations omitted).

**<u>Claims of Plaintiffs Multi-Juice and Hellas Against Snapple and Counterclaim of Snapple</u>**

**Statement of Facts**

---

[1] On April 24, 2003, this Court granted Defendants' motion to dismiss six of the ten causes of action listed in the Complaint.  <u>See</u> <u>Multi-Juice, S.A.</u>, 2003 U.S. Dist. LEXIS 7040.

Unless otherwise indicated, the following facts taken from the Defendant's Local Rule 56.1 Statement are found to be true, as they have been admitted by Plaintiffs or are accepted by the Court as true due to Plaintiffs' failure to cite to any contrary evidence as required by Local Rule 56.1.

Plaintiffs are Multi-Juice, S.A. and Snapple Hellas, S.A. (collectively "Plaintiffs").  Defendant Snapple's Local Rule 56.1 Statement ("Def.'s 56.1") ¶ 1. Plaintiffs' sole owners and principals are Arthur Tavantzis and Naoum "Numi" Tavantzis.  Id. ¶ 2.  Defendant is Snapple.  Id. ¶ 3.  Multi-Juice and the Tavantzises are Counterclaim Defendants.  Id. ¶ 4.

From approximately 1995 to August 1997, Hellas was engaged in the business of importing and distributing Snapple Brand beverages in Greece.  Id. ¶ 5.[2]  On or about February 23, 1996, Hellas brought suit against Snapple and its then-owner, the Quaker Oats Company, in the United States District Court for the Southern District of New York (Case No. 96 CV 1371) (the "Hellas Action"), claiming wrongful termination and breach of contract.  Id. ¶ 6; Orr. Ex. 1 ¶¶ 8, 18.[3]  In or about mid-1997, Triarc Companies, Inc. ("Triarc") acquired Snapple from Quaker.  Def.'s 56.1 ¶ 7.  The Hellas Action was settled on or about August 11, 1997, pursuant to a settlement agreement between Snapple (under

---

[2] Although the Plaintiffs admit this statement, the testimony submitted by the parties indicates that the Tavantzises were in the business of importing and distributing Snapple Brand beverages in Greece from approximately 1992 until prior to February 1996, when Snapple Hellas brought suit against the Quaker Oats Company.  Gray Ex. 6 at 125.  (See infra n.3 for an explanation of the citations to exhibits.)

[3] Citations to exhibits attached to the affidavit of Dennis P. Orr, sworn to on September 30, 2005 as part of Snapple's Motion for Partial Summary Judgment and Local Rule 56.1 Statement, will be designated as "Orr Ex. __"; citations to exhibits attached to the affidavit of Christopher J. Gray, sworn to on October 14, 2005 as part of Plaintiffs' Response to Defendants' Statement Pursuant to Local Rule 56.1, will be designated as "Gray Ex. __"; and citations to exhibits attached to the affidavit of Leslie E. Chebli, sworn to on October 28, 2005 as part of Snapple Beverage Corp.'s Reply to Plaintiffs' Response to Snapple Beverage Corp.'s Statement Pursuant to Local Rule 56.1, will be designated as "Chebli Ex. __".

Triarc ownership), Quaker, the Tavantzises individually, and Hellas (the "Hellas Settlement Agreement").  Id. ¶ 8; Orr. Ex. 7.

The Hellas Settlement Agreement provides, *inter alia*, that "Hellas and Snapple shall negotiate in good faith towards entering into a 3-5 year written agreement under which Snapple would convey to Hellas the exclusive right during the term of that agreement to distribute Snapple beverages in Greece."  Def.'s 56.1 ¶ 9.  The Hellas Settlement Agreement contains an integration clause, providing that "[t]his Agreement constitutes the entire agreement and understanding between the parties hereto with respect to the subject matter contained herein."  Id. ¶ 10.  The Hellas Settlement Agreement also contains a choice of law clause, providing that it "shall be governed by the substantive law . . . of the State of New York."  Id. ¶ 11.  The Tavantzises subsequently formed Multi-Juice, S.A. (together with the Tavantzises, "Multi-Juice").  Id. ¶ 12.

After the Hellas Settlement Agreement, Snapple and Multi-Juice negotiated and exchanged seven drafts of a written distribution agreement.  Id. ¶ 13; Orr Exs. 8-15.  The negotiations on behalf of Multi-Juice were conducted by Louis F. Burke ("Burke").  Def.'s 56.1 ¶ 14.  Burke was authorized at all times to negotiate with Snapple on Multi-Juice's behalf.  Id. ¶ 15.

On or about October 17, 1997, Burke sent a letter to Snapple's counsel, Gary Lyons ("Lyons"), stating, "I just wanted to follow-up with a letter regarding the status of the contract which is being negotiated between Arthur Travis [sic Tavantzis] and Snapple Beverage Corporation . . . a contract must be entered into by the end of October in order to set the stage for labels and production as well as pre-selling . . . we were hopeful that

in view of settling this case back in late August/early September, a contract could have been finalized by this time." Id. ¶ 16; Orr Ex. 16. On or about November 12, 1997, Burke sent a letter to Lyons, stating "Arthur and Naoum are very anxious to finalize this agreement . . . ." Id. ¶ 16; Orr Ex. 17.[4]

As a result of the negotiations between the parties, by December of 1997, Snapple and Multi-Juice reached agreement on all issues, with the exception of the provisions regarding termination. Orr Ex. 12. In a letter to Snapple, dated December 6, 1997, after addressing the termination provision, Burke stated, "We have agreed on all other issues." Id. Attached to Burke's letter is a draft of the distribution agreement, dated December 4, 1997 ("December Draft Distribution Agreement"). Id. ¶ 18.[5]

The parties agreed, *inter alia*, on the following provisions contained in the December Draft Distribution Agreement:

a. Section 6.1: "Products may be ordered by DISTRIBUTOR only pursuant to written purchase orders on the form provided by SNAPPLE. Each such purchase order shall be subject to written acceptance by SNAPPLE at its sole discretion."

b. Section 7.1: "Unless SNAPPLE should otherwise agree in writing in each instance, payment for Products purchased by Distributor hereunder shall be in sterling pounds and payable to Snapple via certified check or electronic funds transfer [or] bank check . . . ."

---

[4] This letter enclosed a marked-up draft agreement dated November 5, 1997.
[5] Plaintiffs admit that the cited materials are authentic and accurately quoted but deny Snapple's claim that Snapple and Multi-Juice reached agreement on all issues. Plaintiffs, however, cite to no evidence contradicting the allegations. In fact, the pages Plaintiffs cite from the deposition of Naoum Tavantzis acknowledge that it was the termination clause that was in dispute. Def.'s 56.1 ¶ 18; Chebli Ex. 3 at 169-72. The remainder of Plaintiffs' citation states that Naoum Tavantzis wanted a contract like a prior contract he once had with Snapple Valley Stream in the early 1990s. Naoum Tavantzis admits that he authorized Mr. Burke to negotiate the distribution agreement on his behalf, Orr Ex. 3 at 139-40, and he does not deny that there was no dispute about the other provisions of the contract being negotiated by Mr. Burke. In fact, Naoum Tavantzis testified that he did not review or provide comments on any of the draft agreements exchanged by the parties but left that to the lawyers. Orr Ex. 3 at 138; Gray Ex. 6 at 194 ("Like I said, with the contracts, I was waiting for a finished one to come at me and be told to sign it. Did I sit there and read them every time? No I didn't"). The only specific provisions mentioned by Naoum Tavantzis in any way refer to the distribution agreement being negotiated by Mr. Burke. Accordingly, this paragraph of Defendant's Rule 56.1 statement is deemed admitted.

c. Section 7.2: "The invoice price of each shipment of products shall become payable by DISTRIBUTOR in full in accordance with SNAPPLE's invoice terms."

d. Section 7.3: "[I]f DISTRIBUTOR is delinquent in payment, upon SNAPPLE's written notice to that effect, DISTRIBUTOR shall reimburse or pay SNAPPLE for all costs and expenses incurred by SNAPPLE in collecting the delinquent amounts, including, but not limited to, reasonable legal fees."

e. Section 12.7: "THIS AGREEMENT AND THE PERFORMANCE OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, UNITED STATES OF AMERICA."

f. Section 12.12: "This Agreement and the Exhibits hereto supersede all prior oral and written communications between the parties concerning, and constitute their sole and exclusive understanding with respect to, the subject matter hereof."

g. Exhibit 3: "TARGETED ANNUAL MINIMUM PURCHASES" provides that "Notwithstanding DISTRIBUTOR's obligation to maximize the distribution of each type and line of Products in the Territory, during the Term of the Agreement the targeted annual minimum volume of purchases by DISTRIBUTOR shall be: Year 1 – 50,000 cases; Year 2 – 100,000 cases; Year 3 – 200,000 cases; Year 4 – 300,000 cases; and Year 5 – 400,000 cases."

Def.'s 56.1 ¶ 19. The Defendant's cited materials are admittedly authentic and accurately quoted. Except for the termination clause, Plaintiffs offer no evidence of disagreement on the above terms, which appear in all later draft agreements. Accordingly, paragraph 19 of Defendant's 56.1 statement is deemed admitted under Local Rule 56.1.

While the parties exchanged additional drafts of the distribution agreement after December of 1997, none of the material provisions changed. Def.'s 56.1 ¶ 20; Orr Exs. 13-15. Plaintiffs claim only that on January 9, 1998, Defendants changed the multiple of annual volume of sales upon an unjustified termination by Snapple in ¶ 11.4 of the

termination provision from $3.00 to $2.00.[6] Plaintiffs' Response to Defendants'

Statement Pursuant to Local Rule 56.1 ("Plaintiffs' Response to Def.'s 56.1") ¶ 20.

Plaintiffs cite no other support for their denial. Accordingly, since Defendants have

admitted that the termination provisions remained in dispute, paragraph 20 of

Defendant's 56.1 Statement is deemed admitted.

Although none of the drafts of the distribution agreement were ever fully executed

by the parties, Snapple and Multi-Juice "operated as if a written exclusive agreement for

the distribution of Snapple products in Greece had been executed among them." Def.'s

56.1 ¶ 21. Orr Ex. 1 (Complaint) ¶ 28.

For each shipment of Snapple products from Snapple to Multi-Juice in 1998 and

1999, Multi-Juice received a detailed invoice of the products in the shipment. See, e.g.,

Orr Ex. 20. Both the prices of the shipment (in pounds sterling) and the terms of the

invoice were printed clearly and plainly on each of the invoices that was sent to Multi-

Juice in 1998 and 1999. Def.'s 56.1 ¶ 22; Orr Ex. 6.

Snapple extended to Multi-Juice a 60-day line of credit. Def.'s 56.1 ¶ 23; Orr Ex.

21. From April 23, 1999 through June 18, 1999, Snapple sent invoices to Multi-Juice

totaling £54,648.50 for products received and accepted by Multi-Juice. Def.'s 56.1 ¶ 24;

Orr Exs. 20, 22-27.[7] On or about April 23, 1999, Snapple invoiced Multi-Juice (Invoice

No. 029-99) in the amount of £10,810.00. Def.'s 56.1 ¶ 23; Orr Ex. 20. On or about

April 23, 1999, Snapple invoiced Multi-Juice (Invoice No. 030-99) in the amount of

---

[6] The $3.00 figure appears for the first time in the draft agreement accompanying Mr. Burke's letter of December 1997. Orr Ex. 12. The termination provision and the $2.00 figure remained unchanged in all future drafts.

[7] Plaintiffs deny that all the products conformed to the orders or that they were accepted but cite to no evidence to support the denial. Accordingly, ¶ 24 of Defendant's 56.1 Statement is deemed admitted. Local Rule 56.1.

£10,810.00.  Def.'s 56.1 ¶ 26; Orr Ex. 22.  On or about June 14, 1999, Snapple invoiced

Multi-Juice (Invoice No. 063-99) in the amount of £11,243.20.  Def.'s 56.1 ¶ 27; Orr Ex.

23.  On or about June 14, 1999, Snapple invoiced Multi-Juice (Invoice No. 064-99) in the

amount of £11,773.30.  Def.'s 56.1 ¶ 28; Orr Ex. 24.  On or about June 18, 1999, Snapple

invoiced Multi-Juice (Invoice No. 067-99) in the amount of £10,452.00.  Def.'s 56.1

¶ 29; Orr Ex. 25.

A handwritten entry from October 18, 1999 in Multi-Juice's desk calendar ("Date

Book Entry") is entitled "Imports 1999."  Def.'s 56.1 ¶ 30; Orr Ex. 26; Ex. 27 at 265:18-

269:24.  The Date Book Entry was written by Evangelia Tavantzis, Naoum's wife and

Multi-Juice's bookkeeper.  Def.'s 56.1 ¶ 30; Orr Ex. 27 at 266:10-13.  The left side of the

Date Book Entry lists the 1999 Invoices from Snapple by number and date.  Def.'s 56.1 ¶

31; Orr Ex. 26; Ex. 27 at 267:21-269:13.  These invoices are broken down by flavors,

number of cases, and pallets.  Def.'s 56.1 ¶ 31; Orr Ex. 26.  Each invoice also

corresponds to an amount listed in British Pounds (sterling).  Id.  A box at the bottom of

the Date Book Entry is labeled "TOTALS" and lists an amount of "£54,648.5."  Id.

Multi-Juice failed to pay the amounts due and owing under the 1999 Invoices.

Def.'s 56.1 ¶ 32; Orr Exs. 6, 28-33.  Representatives of Snapple contacted Multi-Juice on

numerous occasions regarding the amounts past due and owing.  Def.'s 56.1 ¶ 33; Orr

Exs. 6, 28, 30-33.[8]  On or about October 27, 1999, Donna Bimbo of Snapple sent an e-

mail to Multi-Juice stating, *inter alia*:

> As agreed, we did extend your credit terms to 60 days from collection
> date.  These terms were agreed upon based on a mutual understanding that
> you would pay on time . . .

---

[8] Plaintiffs deny this but admit the authenticity of the materials cited.  Since Plaintiffs cite to no evidence
supporting their denial, it is admitted by Local Rule 56.1.

We feel that Multi-Juice has not lived up to the terms agreed upon, not only has the 1998 balance just been cleared but we are now in a situation whereby transactions for calendar 99 for Multijuice are outstanding and overdue dating back to August 18th, 99.

This is a very serious situation that needs to be addressed immediately. We have tried unsuccessfully to contact both yourself and Arthur on numerous occasions dating back from September 13 continuing on to October 27th sometimes 2 to 3 times a day with no response.

Def.'s 56.1 ¶ 34; Orr Ex. 28.

In late 1999, Multi-Juice ceased operations without providing notice to Snapple.

Def.'s 56.1 ¶ 35; Orr Exs. 31-34. Plaintiffs deny this allegation, citing the deposition of Naoum Tavantzis, Grey Ex. 6 at 342-46, and assert without citing to evidence that they believe Defendants were aware that Multi-Juice had ceased operations by at [the] latest December 1999 and that several of the subsequent purported attempts to communicate with Multi-Juice by Snapple were made by Snapple after it knew that Multi-Juice's office was closed "to set up Snapple's position for anticipated litigation." Naoum Tavantzis' testimony was as follows:

Q:      What steps did Multi-Juice take to close down its operations?

A:      I told Paula the day before I had enough of this shit.

Chebli Ex. 3 at 342.

Q:      Did you or Ms. Silva say anything else during the course of that conversation?

A:      I think I just mentioned that the letter is ridiculous about the rules, I am with Snapple Beverage for 12 years, you are selling this product for about eight months, you don't even know what it is and you are telling me and Donna is telling me that there are rules here that if another product, I have to abide by the rules and if the Whipper sells more than the Snapples, it's your fault.

Id. at 344-45.  When specifically asked if he informed Ms. Silva in that conversation that Multi-Juice would no longer be distributing products in Greece, Mr. Tavantzis admitted he did not do so: "Did I go over it like that?  No."  Id. at 344.

On or about January 31, 2000, Paula Silva of Snapple sent a fax to Multi-Juice stating, "I enclose a small summary of issues which we have been trying to address and unfortunately have not had any response from you."  Def.'s 56.1 ¶ 36; Orr Ex. 31.  On February 9, 2000, Evangelia ("Evie") Tavantzis forwarded a fax from Ms. Silva to Mr. Burke, containing the information from Ms. Silva's January 31, 2000 fax and including a note from Evie stating, "Mr. Burke, if you need the original copy please let me know and I will mail it to you, otherwise Numi can bring it to your office sometime next week upon his return from Greece."  Orr Ex. 32.  The fax states:

1) Outstanding balance calendar 1999 – The balance of GBP 54,000 remains unpaid and we have not received any information or payment update.  It is imperative that you solve this matter.  As you are aware our trading terms are 60 days and most of these sales date back to early 99.

2) Product ordered October 99 – Since November 8, 99 we have had your ordered container of product sitting at our copacker's warehouse for which we are incurring warehousing costs.  We have requested several times that you collect it or give an update on this item to no avail.  Please update us on this issue.

3) Snapple 330 ml budget projection – We have not yet received your budget forecast for calendar 2000.  Please submit these as promptly as possible.

4) Snapple Marketing funds – In order to ascertain our marketing contribution for calendar 2000 we request that you submit your marketing plans with urgency.

We request that you improve the level of communication between our companies.  It has been 3 months since we have been able to communicate with Multijuice and there seems to be no response there at the moment.

Id.; Def.'s 56.1 ¶ 36.

On or about June 23, 2000, Snapple sent a letter to Multi-Juice stating, *inter alia*, "As you are aware, you have been delinquent for a long time in paying our invoices in spite of the various grace periods that we have extended to you.  As of today your account has an outstanding balance totaling more than £54,000 GBP (sterling).  We have been trying to contact you since October 28, 1999 . . . Unfortunately, we have received no response from you."  Def.'s 56.1 ¶ 37; Orr Ex. 33.

**Plaintiffs' Additional Triable Issues of Fact**

This Court will disregard Plaintiffs' "Additional Triable Issues of Fact," as they fail to provide citations to evidence and thus do not comply with the requirements of Fed. R. Civ. P. 56(e) and Local Civil Rule 56.1.  Local Civil Rule 56.1(b) states that the papers opposing a motion for summary judgment "shall include a separate, short and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried," and Rule 56.1(d) provides that "[e]ach statement of material fact by a movant or opponent must be followed by citation to evidence which would be admissible, set forth as required by Federal Rule of Civil Procedure 56(e)."  Plaintiffs do not cite any evidence in support of their Additional Triable Issues of Fact.  Accordingly, the Court does not take these alleged issues of fact under consideration.

**DISCUSSION**

**Defendant's Motion to Dismiss Plaintiffs' First Cause of Action**

Defendants move to dismiss the Plaintiffs' First Cause of Action pursuant to Rule 56 of the Federal Rules of Civil Procedure.

**Choice of Law**

Multi-Juice asserts that its breach of contract claim is governed by the U.N. Convention on Contracts for the International Sale of Goods, codified at 15 U.S.C. Appendix (1985) (hereinafter "CISG"). Complaint ("Compl.") ¶ 1. Plaintiffs claim that the CISG provides for the enforcement of oral agreements such as the exclusive distributorship agreement here. Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Partial Summary Judgment ("Plaintiffs' Mem. in Opp.") at 10. Article 11 of the CISG states that "[a] contract of sale need not be concluded in or evidenced by writing and is not subject to any other requirement as to form. It may be proved by any means, including witnesses." However, Article 1 of the CISG states that the "Convention applies to *contracts of sale of goods* between parties whose places of business are in different States: (a) when the States are Contracting States . . ." (emphasis added) and does not indicate that it applies to distribution agreements. See Helen Kaminski v. Marketing Australian Products, 1997 U.S. Dist. LEXIS 10630 (S.D.N.Y.) (determining that the CISG does not apply to distributorship contracts that do not cover the sale of specific goods and contain definite terms regarding quantity and price); Viva Vino Import Corporation v. Farnese Vini, 2000 U.S. Dist. LEXIS 12347 (E.D.Pa) (stating that "[b]ecause the agreements at issue in this case do not cover the sale of specific goods and set forth definite terms regarding quantity and price, the CISG is inapplicable"). See also UNCITRAL Digest of Case Law on the United Nations Convention on the International Sale of Goods ("UNCITRAL Digest") ("[m]ost courts considering the issue have concluded that the Convention does not apply to distribution agreements"). See

UNCITRAL Digest, A/CN.9/SER.C/DIGEST/CISG/1 [8 June 2004], available at

http://www.cisg.law.pace.edu/cisg/text/digest-art-01.html#ud5.

Accordingly, since Plaintiffs' counsel has acknowledged that if the CISG does not

apply, New York law would apply, see Transcript of Jan. 19, 2006 Hearing ("Tr.") at 50,

and since all the draft distribution agreements (referred to in paragraph 24 of the

Complaint) exchanged between the parties from November 1997 to April 1998 contain a

choice of law provision for New York law, see Orr Exs. 8-14, and the choice of law

provision in the Hellas Settlement Agreement provides that it shall be governed by New

York law, see Hellas Settlement Agreement ¶ 11, New York law governs the Plaintiffs'

breach of contract claims.

**Review of the Evidence**

Plaintiff's Complaint states that "[i]n or about August 1997 in accordance with

the settlement,[9] Triarc/Snapple entered into an oral distribution agreement with Multi-

Juice, whereby Multi-Juice was established as the exclusive importer and distributor of

Snapple Beverages for the country of Greece." Compl. ¶ 2.

At oral argument, Plaintiffs maintained that Plaintiffs' oral contract was based on

conversations Arthur and Naoum Tavantzis had with Donna Bimbo, an executive of

Mistic, a subsidiary of Triarc,[10] in May 1997 in New York City. Plaintiffs claim that

pursuant to those conversations, they were to get a five-year exclusive right to distribute

Snapple in Greece, and that the parties contemplated a contract similar to the contract

---

[9] The Complaint alleges that the settlement refers to the August 1997 settlement of a lawsuit brought by
Snapple Hellas, owned by Arthur and Naoum Tavantzis, against Snapple and its parent, the Quaker Oats
Company. Complaint ¶ 8. From approximately 1995 to August 1997, Snapple Hellas was engaged in
importing and distributing Snapple brand beverages throughout Greece on an exclusive basis. Id.
[10] Triarc acquired Snapple in or around May of 1997. Although it is unclear whether Ms. Bimbo was an
officer of Snapple at the time of those conversations, for the purposes of this Opinion the Court assumes
that Ms. Bimbo was an officer.

Multi-Juice principals had with Snapple at an earlier date. Transcript of January 19, 2005 Hearing ("Tr.") at 45.[11] That there was any such final understanding is refuted by the terms of the Hellas Settlement Agreement.

The Hellas Settlement Agreement was dated August 1997 and signed by the Tavantzises, as well as Snapple Hellas, Snapple, and the Quaker Oats Company. Two of its terms were:

> 4. <u>Distribution Agreement</u>. Hellas and Snapple shall negotiate in good faith towards entering into a 3-5 year written agreement under which Snapple would convey to Hellas the exclusive right during the term of that agreement to distribute Snapple beverages in Greece. Except to the extent permitted by the distribution agreement contemplated by this paragraph, Hellas shall not use the word "Snapple" in any way as part of its business, including as part of its corporate name.

> \* \* \*

> 13. <u>Entire Agreement</u>. This Agreement *constitutes the entire agreement and understanding* between the parties hereto with respect to the subject matter contained herein.

Orr Ex. 7, ¶¶ 4, 13 (emphasis added). Thus, the settlement agreement provisions – that the parties would negotiate in good faith towards entering into a 3-5 year distribution agreement and that the agreement constituted the entire agreement and understanding between the parties – disprove Plaintiffs' assertion that the parties had agreed in August to reinstate the earlier agreement.

Furthermore, subsequent to the settlement agreement, Louis Burke, Esq., who was authorized to negotiate the distribution agreements by the Tavantzises and Multi-Juice, exchanged seven written drafts of an exclusive distributorship agreement over a period from October 1997 through April 1998 between Snapple and a corporation to be named

---

[11] Plaintiffs argued that their distribution agreement referred to a contract along the lines of one Snapple (then a private entity known as Snapple Valley Stream) had with Plaintiffs in the early 1990s. Tr. at 46, 49; Grey Ex. 6 at 124-25.

later.[12]  Plaintiffs have offered no evidence that during or after August 1997, Mr. Burke or anyone at Snapple ever agreed to resurrect the terms of the contract under which Plaintiffs claim they are suing.  Furthermore, Mr. Burke's exchange of drafts of the written distribution agreement containing terms dissimilar from the earlier contract disprove the Complaint's assertion that Snapple and Plaintiffs agreed orally on a five-year exclusive distribution agreement in or around August 1997.  Compl. ¶ 1.

Since Plaintiffs have failed to present any evidence that the parties entered into a five-year oral exclusive distribution agreement after the settlement agreement in August 1997, Defendant's motion to dismiss Multi-Juice's breach of contract claim set forth in the Complaint is granted.

Secondly, Plaintiff's oral distribution agreement is unenforceable because the alleged terms are fatally vague and indefinite.  John Street Leasehold LLC v. FDIC states:

> It is well settled that for a contract to be valid, the agreement between the parties must be definite and explicit so their intention may be ascertained to a reasonable degree of certainty.  Even if the parties believe that they are bound, if the terms of the agreement are so vague and indefinite that there is no basis or standard for deciding whether the agreement has been kept or broken, or to fashion a remedy, and no means by which such terms may be made certain, then there is no enforceable contract.

1998 WL 411328 at *3 (S.D.N.Y. July 22, 1998) (quoting Candid Prods. Inc. v. Int'l Skating Union, 530 F. Supp. 1330, 1333 (S.D.N.Y. 1982)).  The Plaintiffs assert that the terms of the contract in this action "are evidenced by, inter alia, the parties' promises to one another, the terms in the draft distribution agreements,

---

[12] Naoum Tavantzis testified at his deposition that the terms of the draft agreements were different from the terms of the earlier contract he had talked about with Ms. Bimbo in May or June 1997, Grey Ex. 6 at 114-15, 123, 138, that he did not review or offer any comment on the drafts, Chebli Ex. 3 at 138, and that Mr. Burke was authorized to negotiate the agreement on his behalf.  Id. at 140.

and the parties' performance" and that the Court should "look to commercial practice or trade usage to supply missing contract terms." Plaintiffs' Mem. in Opp. at 20-21. At oral argument, the Court asked Plaintiffs' counsel, Mr. Gray, about the terms of the contract. Mr. Gray responded:

> Terms of the contract were five years exclusive right for the plaintiff to distribute Snapple in Greece and the parties contemplated a contract similar to the contract, a Multi-Juice principals had with Snapple on an earlier date.

Tr. at 45. When the Court questioned Mr. Gray about Plaintiffs' evidence of the terms of the oral agreement, Mr. Gray stated, "We have a previous contract from the early 90s between the Tevances [sic] and Snapple." The only testimony to which the Plaintiffs could point in support of the theory that the parties would rely on the earlier contract is testimony about the dinners the Tavantzises had with Donna Bimbo in or about May 1997: "The testimony of the Tevances [sic] is that at the dinners in or about May 1997 in – talked to Ms. Bimbow [sic] [about] a contract along the lines of [a] contract that Snapple had had with the plaintiffs back in the early 90s." Id. at 46. However, the terms of that contract have not been presented to the Court and, as stated earlier, that claim is contrary to the August 1997 settlement agreement provision that the parties would negotiate towards entering into a written exclusive agreement and that the settlement agreement represented the entire agreement of the parties and encompassed their understanding. Id. The draft distribution agreements exhibited by Snapple are the only agreements presented that show the terms of an oral distribution agreement, and none of them have been executed by the parties. Furthermore, Plaintiffs would not identify any terms of those agreements to which they had agreed or disagreed other than the termination provision. Id. at 54-55. Thus, Plaintiffs have not sufficiently demonstrated

the terms upon which the Plaintiffs went forward on the alleged oral distribution agreement.  Therefore, Plaintiffs' position that an oral distribution agreement existed between the two parties fails for vague and indefinite terms.

Plaintiffs' claim of a five-year oral distribution agreement also violates New York's Statute of Frauds.  Under §2-201(1) of the Uniform Commercial Code ("UCC"):

> Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker.

Because the distribution of goods in question here involved the purchase of more than $500 of goods from Snapple, there would have to be a writing for the exclusive distribution agreement to be enforceable.

In addition, the pertinent provision of the New York Statute of Frauds provides:

> a. Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:
>> 1. By its terms is not to be performed within one year from the making thereof or the performance of which is not to be completed before the end of a lifetime . . .

See N.Y. General Obligations Law § 5-701 (McKinney 1978).  "It is equally clear that the Statute of Frauds forbids the imposition of a performance obligation on a defendant necessarily extending beyond one year, in the absence of a writing(s) which sets forth all of the essential terms of the agreement imposing that performance obligation."  City of Yonkers v. Otis Elevator Co., 649 F.Supp. 716, 727 (S.D.N.Y. 1986) (internal citations omitted).  The distribution agreement alleged by Plaintiffs is a five-year agreement to distribute Snapple products in

Greece.  Tr. at 45.  Therefore, it is an agreement that necessarily extends the performance obligation of both parties beyond one year and should be in writing and subscribed by the party to be charged in order to satisfy the Statute of Frauds. Because there was no signed agreement here that sets forth all of the essential terms of the agreement, the oral distribution agreement asserted by Plaintiffs is not enforceable.

Plaintiffs argue that Defendants waived the affirmative defenses of Statute of Frauds and parol evidence rule by not asserting these defenses in their Answer, Plaintiffs' Mem. in Opp. at 3, citing Fed. R. Civ. P. 8(c), which requires in pertinent part that:

> In pleading to a preceding pleading, a party shall set forth affirmatively
> . . . statute of frauds . . . and any other matter constituting an avoidance or
> affirmative defense.

Rule 8(c) of the Federal Rules of Civil Procedure does not specifically state the consequences of failing to raise an affirmative defense in the pleadings.  5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1278 (2d ed. 1990) (hereinafter "Wright & Miller").  Generally, a failure to plead an affirmative defense results in its waiver and its exclusion from evidence.  See Dole v. Williams Enters., Inc., 876 F.2d 186 (D.C. Cir. 1989); see also Wright & Miller § 1278.  However, a party's motion for summary judgment may be regarded as a motion to amend its pleadings under Fed. R. Civ. P. 15(a) if the party asserts an unpleaded affirmative defense.  Royal Ins. Co. of Am. v. DHL Worldwide Express, 1999 WL 494118, at *4 (S.D.N.Y. July 13, 1999); see Block v. First Blood Assocs., 988 F.2d 344, 350 (2d Cir. 1993) (affirming district

court's consideration of motion for summary judgment containing unpleaded affirmative defense as motion to amend under Fed. R. Civ. P. 15(a)); see also City of Yonkers v. Otis Elevator Co., 649 F.Supp. 716, 726 n.14 (S.D.N.Y. 1986) (concluding that "on a motion for summary judgment, the Court may properly consider the Statute of Frauds defense [not raised in the answer], even without formal amendment of the pleadings"), aff'd 844 F.2d 42 (2d Cir. 1988).

Under the Federal Rules of Civil Procedure, courts are enjoined to liberally grant amendments to pleadings. See Fed. R. Civ. P. 15(a); see also Fed. R. Civ. P. 8(c). The standards governing a motion to amend under Rule 15(a) may be imported into an analysis of whether an affirmative defense should be considered when it is raised for the first time in a motion for summary judgment. The Supreme Court has indicated:

> In the absence of any apparent or declared reason – such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc. – the leave sought should, as the rules require, be 'freely given.'

Foman v. Davis, 371 U.S. 178, 182 (1962).[13] "The rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith." Block, 988 F.2d at 350. Delay alone will not prevent an amendment to the pleadings, though the longer the period of

---

[13] The policy of liberally permitting amendments is also manifest in Rule 15(b), which permits an issue omitted from pleadings to be treated as if it had been raised in the pleadings if the issue is entered into evidence and "tried by the express or implied consent" of the parties. Fed. R. Civ. P. 15(b). Even when the adverse party objects to the late introduction, Rule 15(b) gives the trial court discretion to permit an amendment to the pleadings and states that it "shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party." Id.; see also Hillburn by Hillburn v. Maher, 795 F.2d 252, 264 (2d Cir. 1986), cert. denied, 479 U.S. 1046 (1987).

unexplained delay, the lighter the burden will be on the nonmoving party to demonstrate prejudice or bad faith.  See id.; Lippold v. Duggal Color Projects, Inc., 1998 WL 91198 at *1 (S.D.N.Y. Mar. 2, 1998).  In analyzing prejudice to the nonmovant, courts must consider whether permitting the new defense would "(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction."  Block, 988 F.2d at 350; see also Lippold, 1998 WL 91198, at *1.

Here, Defendants maintain that they did not assert a Statute of Frauds defense in their answer because Plaintiffs expressly alleged that the parties "operated as if a written exclusive agreement for the distribution of Snapple product in Greece had been executed among them."  Compl. ¶ 28; Snapple Beverage Corp.'s Reply Memorandum of Law in Further Support of its Motion for Partial Summary Judgment ("Snapple's Reply") at 5.  Consequently, Defendants argue that "it did not become clear to Snapple until plaintiffs' answer to Snapple's counterclaims and plaintiffs' depositions that they intended to disavow the written distribution agreement."  Snapple's Reply at 6; cf. City of Yonkers, 649 F.Supp at 726 n.14 (noting that "given the circumstances that plaintiffs' complaint might reasonably have led defendants to believe that plaintiffs were relying on a written contract . . . this would be an especially inappropriate case to invoke concepts of waiver against the defendants").  Plaintiffs do not argue that they would be unduly prejudiced by Snapple's assertion of a Statute of Frauds defense, and there is no indication that such an allowance would require Plaintiffs to expend significant additional resources to conduct discovery and prepare for trial, significantly delay the resolution of

the dispute, or prevent Plaintiffs from bringing a timely action in another jurisdiction.

Block, 988 F.2d at 350.  Accordingly, the Statute of Frauds defense is allowed

notwithstanding Defendants' failure to plead this defense in its answer.

Because Plaintiffs have not identified a writing containing the terms of their

claimed oral distribution agreement that is sufficient to indicate that a contract was made

between the parties and because Plaintiffs claim the oral distribution agreement operated

for a five-year period, the oral distribution agreement asserted by Plaintiffs is not

enforceable under the Statute of Frauds.

**Plaintiffs' Claim of Promissory Estoppel**

Plaintiffs argue that if the Court finds that there was no contract, Defendants are

liable under the doctrine of promissory estoppel because the Tavantzises traveled to

Greece and expended substantial sums in express, detrimental reliance on various specific

promises of an exclusive distribution agreement made by Donna Bimbo.  Plaintiff's

Mem. of Law in Opp. to Defendants' Motion for Partial Summary Judgment ("Plaintiff's

Mem. in Opp.") at 22.  In New York, promissory estoppel has three elements: "a clear

and unambiguous promise; a reasonable and foreseeable reliance by the party to whom

the promise is made; and an injury sustained by the party asserting the estoppel by reason

of his reliance."  Arcadian Phosphates, Inc. v. Arcadian Corp., 884 F.2d 69, 73 (2d Cir.

1989) (internal citations omitted).

Plaintiffs' Complaint, however, does not contain a claim for promissory estoppel,

and Plaintiffs have not moved to amend their Complaint.  Because the claim is raised in

Plaintiffs' answering papers, however, the Court could allow it even if discovery has long

been closed if Plaintiffs can demonstrate that such a claim is appropriate on the facts of

this case and if they have provided specific evidence of such expenditures to the Defendant. If Plaintiffs wish to pursue this claim, they must move to amend by motion papers to be filed by **June 12, 2006**, setting forth in a non-conclusory manner their claim for promissory estoppel together with a supporting memorandum demonstrating that there is valid legal support for making the claim under the circumstances presented here.

**Fourth Cause of Action – Breach of Hellas Settlement Agreement**

In their Fourth Cause of Action, Plaintiffs allege that Triarc/Snapple "made numerous promises and representations to the principals of Hellas to induce Hellas into accepting a significant reduction in the cash consideration portion of the Hellas Action settlement in exchange for remaining Triarc/Snapple's exclusive importer and distributor of Snapple products in Greece." Compl. ¶ 99. Plaintiffs claim that pursuant to the Hellas Settlement Agreement, Triarc/Snapple agreed to negotiate in good faith towards entering into a written agreement for Multi-Juice's exclusive distribution of Snapple in Greece, which constituted an important portion of the consideration for the settlement of Hellas' claims. Id. ¶ 100. While Plaintiffs correctly maintain that no agreement was ever executed between Snapple and Multi-Juice, despite the exchange of seven drafts of a written distributorship agreement, id. ¶ 101, Plaintiffs offer no evidentiary support for the claim that Snapple negotiated in bad faith. During arguments on January 19, 2006, the only relevant statement to which the Plaintiffs could point to was paragraph 20 of Plaintiffs' Response to Defendants' Statement Pursuant to Local Rule 56.1, dated October 14, 2005, which states, "[t]he price term in ¶ 11.4 changed from $3.00 to $2.00 [in the Draft Distribution Agreement, dated 1/9/98]." However, a change in the dollar

amount in the penalty provision in the event of an unjustified termination is evidence of business negotiations, not necessarily bad faith.

The negotiations between Mr. Burke and Snapple continued after January 9, 1998, and the price term in the later drafts continued to be $2.00 per case in the event of an unjustified termination in any year. Orr Exs. 13-15. Plaintiffs went ahead with the exclusive distribution arrangement in March or April of 1998.

Multi-Juice's claim that Snapple negotiated this provision in bad faith is not credible. The Tavantzises, who were also the principals of New Age, entered into a distribution agreement for Mistic, a competitive product, in February 1996. That distribution agreement had a price term in the termination provision of $1.50 per case in the event of unjustified termination after the third year of the agreement and nothing for termination in earlier years. <u>See</u> Orr Mistic Ex. 3. Thus, Snapple was willing to agree to a price term in the Snapple/Multi-Juice January 9, 1998 distribution agreement that was fifty cents per case higher than the Tavantzises were willing to settle for in the New Age/Mistic distribution agreement and that also pertained to the first two years as well as the final three years of the agreement. Based on this evidence, no reasonable jury could conclude that Snapple negotiated in bad faith.[14] Therefore, Plaintiffs have not set forth evidence which could reasonably support a jury finding of bad faith negotiations by Snapple, and the Fourth Cause of Action is dismissed.

---

[14] The provision in ¶ 11.4 was first suggested by Mr. Burke in his December 4, 1997 draft and concerned a payment to the distributor for an unjustified termination by Snapple based on the number of cases of product the distributor sold in the previous twelve months. Orr Ex. 12. In his December 6, 1997 letter to Ms. Bimbo, Mr. Burke suggests that the provision would only apply if termination occurred after the second year. <u>Id.</u>

## Counterclaim Breach of Contract Against Multi-Juice and Attorneys' Fees

Defendant/Counterclaim Plaintiff Snapple contends that it is entitled to summary judgment on its counterclaims for breach of contract against Multi-Juice for Multi-Juice's unpaid balance of £54,648.50 (sterling), plus interest, costs, and attorneys' fees.  Snapple claims that it sent invoices for this amount to Multi-Juice from April 23, 1999 through June 18, 1999 for products received and accepted by Multi-Juice.  Def.'s 56.1 ¶ 24; Orr Exs. 20, 22-27.  Multi-Juice failed to pay the amounts due and owing under the 1999 Invoices.  Defendant's 56.1 ¶ 32; Orr Ex. 6 ¶¶ 1, 22; Exs. 28-33.  The evidence shows that representatives of Snapple contacted Multi-Juice on numerous occasions regarding the amounts past due and owing and that Multi-Juice was aware of these outstanding invoices.  Def.'s 56.1 ¶ 33; Orr Exs. 26-32.

Plaintiffs claim that there are triable questions of fact concerning whether any sums Plaintiff Multi-Juice may owe Snapple are offset by sums owed by Snapple to Multi-Juice.  Plaintiff's Mem. in Opp. at 24.  Plaintiffs claim that some of the goods delivered by Snapple to Multi-Juice arrived late or damaged or were the wrong flavors.  Id.  However, Plaintiffs identify no evidence in their 56.1 Statement to counter Snapple's counterclaim and to corroborate their defense that the deliveries were late, damaged, or were the wrong flavors.

Defendant Snapple argues based on the terms of the five-year draft distribution agreements that Multi-Juice breached its contract with Snapple.  None of the agreements were ever executed and thus they violate the Statute of Frauds.[15]  In the alternative, Defendant Snapple maintains that it is still entitled to summary judgment on its counterclaims under U.C.C. § 2-201(3)(c), which provides that an otherwise

---

[15] See supra pages 18-22.

unenforceable agreement is enforceable "with respect to goods . . . which . . . have been received and accepted."  Because the evidence submitted by Snapple demonstrates that the Snapple goods were received and accepted by Plaintiff Multi-Juice, <u>see</u> Orr Ex. 26, Ex. 27 at 265:18-269:24, and Plaintiff has submitted no evidence that the deliveries were nonconforming or of damaged goods, Defendants can recover the cost of such goods under this U.C.C. provision.  Therefore, summary judgment is granted as to Defendants' breach of contract claim for £54,648.50 plus interest.

Snapple's counterclaim for attorneys' fees is based on a term in the draft Distribution Agreement, which states that "if [Multi-Juice] is delinquent in payment, upon SNAPPLE's written notice to that effect, [Multi-Juice] shall reimburse or pay SNAPPLE for all costs and expenses incurred by SNAPPLE in collecting the delinquent amounts including, but not limited to, reasonable legal fees."  Orr Ex. 12 ¶ 7.3; Snapple Beverage Corp.'s Memorandum of Law in Support of its Motion for Partial Summary Judgment at 21.  The draft Distribution Agreements were never executed by the parties, however, so there is no basis for Defendant's claim.  Therefore, Defendant's counterclaim for attorneys' fees is denied.


**<u>Plaintiff New Age's Motion for Summary Judgment for Breach of Contract Claim Against Mistic</u>**

**Statement of Facts**

The following facts are taken from Plaintiff New Age's Local 56.1 Statement in Support of its Motion for Summary Judgment ("Plaintiff New Age's 56.1") on its breach of contract claim against Defendant Mistic Brands Inc., as well as Defendant's Mistic's Rule 56.1 Statement in response thereto ("Defendant's Response to Plaintiff's 56.1") and

Mistic's Counterstatement of Facts. If enclosed by brackets, the Rule 56.1 Statement is not accepted as proved because it is not supported by citations to evidence or because the cited evidence does not support the Rule 56.1 Statement.

1. Donna Bimbo generated Gray New Age Ex. 2[16] on behalf of Mistic in or about October 1995 in connection with her duties as Director of International Business at Mistic. Gray New Age Ex. 1 at 163-64.

2. Gray New Age Ex. 2 is a true copy of the Mistic Distribution Agreement executed by New Age and Mistic on October 13, 1995. Plaintiff New Age's 56.1 ¶ 1; Defendant's Response to Plaintiff New Age's 56.1 ¶ 2. An amendment to that contract was entered into by Mistic and New Age in or about February 1996. Orr Mistic Ex. 3.[17]

3. Mistic has never canceled or terminated the Mistic Distribution Agreement. Plaintiff New Age's 56.1 ¶ 3. Although this statement is not supported by Plaintiff's citation to the testimony of Louis Burke at page 283, Mistic does not claim it cancelled or terminated the Mistic Distribution Agreement. Accordingly, the statement is accepted.

4. Arthur and Naoum Tavantzis formed New Age to enter into the Mistic Distribution Agreement. Plaintiff New Age's 56.1 ¶ 4.

5. New Age never in fact distributed Mistic because before it did so, Triarc acquired Snapple and expressed a preference to move forward with the distribution of

[16] Citations to exhibits attached to the affidavit of Dennis P. Orr, sworn to on October 14, 2005 as part of Mistic Brand's Response to New Age Beverage Hellas's Statement Pursuant to Local Rule 56.1 and Counterstatement of Facts, will be designated as "Orr Mistic Ex. __"; citations to exhibits attached to the affidavit of Christopher J. Gray, sworn to on October 14, 2005 in support of New Age's Motion for Summary Judgment, will be designated as "Gray New Age Ex. __".
[17] In its reply papers, New Age does not contend that Orr Mistic Ex. 3 is not authentic.

Snapple, rather than Mistic, products in Greece. Grey New Age Ex. 5 at 197. In May 1997, Donna Bimbo told the Tavantzises, "we are not going to do Mistic, we just bought Snapple, so we are going to go right into the Snapple, so there is no need to bring Mistic into the country." Id. at 197:16-21; see also the testimony of Naoum Tavantzis: "there's two products in the store, I would rather have the Snapple, and that's what happened, you know, so we put Mistic on the back burner, she did, Donna, she said 'We are not going to launch it,' and I said 'Fine, I don't have a problem with it.'" Orr Mistic Ex. 8 at 146:21-147:3.

6. [Arthur and Naoum Tavantzis expended funds in order to establish a warehouse and office in Greece for the purpose of distributing beverages.] Plaintiff New Age's 56.1 ¶ 6. New Age does not support this claim by page citation to testimony or exhibits.

7. [Arthur and Naoum Tavantzis expended funds in order to establish a warehouse and office in Greece for the purpose of distributing beverages pursuant to the Mistic Distribution Agreement.] Plaintiff New Age's 56.1 ¶ 7. The cited testimony of Naoum Tavantzis, Grey New Age Ex. 4 at 128-29, does not support this statement. Rather, his testimony was that Donna Bimbo, at some point around May of 1997, promised Naoum Tavantzis that he would go back to Greece and distribute both Snapple and Mistic.

8. [During 1999 Felegara Foods threatened to terminate its co-packing agreement with Snapple Beverage Corp. and/or Snapple Europe Ltd.] Plaintiff New Age's 56.1 ¶ 8. This statement is not shown to be relevant to New Age's breach of contract claim.

9. Mistic sold Mistic products under the Mistic Brand trademark to Alikia B. Papadavid & Co. during 1999. Plaintiff New Age's 56.1 ¶ 9. Orr Mistic Ex. 9 at 141-43.

10. Mistic sold Mistic products under the Mistic brand trademark to Papadavid during 1999 that were intended for ultimate consumption within the Republic of Greece. Plaintiff New Age's 56.1 ¶ 10; Orr Mistic Ex. 9 at 141-43; Gray New Age Ex. 7, Invoice and Report and Statement reflecting 6/30/99 sale for $39,382.00.

11. [Alikia B. Papadavid is not an agency of the government of the United States.] Plaintiff New Age's 56.1 ¶ 11. There are no cited pages of testimony for this statement.

12. Mistic did not notify New Age of the inquiries or orders that it received from Papadavid concerning the purchase of Mistic Products for ultimate consumption within the Republic of Greece. New Age cites to Donna Bimbo's testimony but there are no specific pages cited to support this statement.

**Mistic's Counterstatement of Facts**

1. New Age and Mistic entered into the Initial New Age Agreement on or about October 13, 1995. Orr Mistic Ex. 2.

2. New Age and Mistic entered into the New Age Amendment in or about February 1996. Orr Mistic Ex. 3. The New Age Amendment provides that its "paragraphs totally replace the respective sections in the [Initial New Age Agreement] or are added to the [Initial New Age Agreement] and incorporated therein. Id.

3. Section 1.6 of the New Age Distribution Agreement provides that:

The term commences on the date the Distribution's carrier receives delivery of Distributor's first purchase order which has been accepted by MBI for beverage products.

Id. § 1.6

4.  Section 3.11 of the New Age Distribution Agreement provides:

New Age Beverage Hellas, its principals and Mr. Arthur Tavantzis certify that none of its family members, relatives or other owners have any connection with any person or businesses doing business with Snapple Beverages or the Quaker Oats Company in the Country of Greece.

Id. § 3.11.

5.  Section 4.1 of the New Age Distribution Agreement obligated New Age

to:

Maximize the distribution of each type and line of Products throughout the Territory and, to that end, maintain a qualified staff, experienced and skilled in the distribution of goods corresponding in quality to the Products, engage in capital investments, leases or acquisitions of services or equipment necessary to carry out such maximized distribution and participate with MBI in the cooperative advertising and marketing program described in [Orr Mistic] Exhibit 4 hereto.

Orr Mistic Ex. 2 § 4.1.

6.  Section 4.2 of the New Age Distribution Agreement obligated New Age to:

Commence the performance of duties hereunder, including, but not limited to, the sale of products within the Territory in accordance with the marketing plan by no later than thirty (30) days from the commencement of production of the 500 ml bottle 12-pack case in the U.S.  Failure to place orders in accordance with the marketing plan for the sale of products within the allotted 30 days constitutes a material breach of this Agreement.

Orr Mistic Ex. 3 § 4.2.

7.  Section 11.1 of the New Age Distribution Agreement provides that:

The term of this Agreement shall commence on the day Distributor's carrier receives delivery of Distributor's first purchase order accepted by MBI for beverage products.

Id. §11.1.

8. Mistic never hired personnel. Orr Mistic Ex. 5 at 204:8-9.

9. Mistic never established a location in Greece. Id. at 204:10-12.

10. New Age never placed an order for Mistic products. Id. at 197:4-6; Orr Mistic Ex. 8 at 149:10-14; Ex. 9 at 126:11-16.

11. New Age never distributed Mistic products. Orr Mistic Ex. 5 at 197:7-9; Ex. 7; Ex. 8 at 143:9-11.

12. In short, New Age never did business. Orr Mistic Ex. 5 at 204:19-20.

13. The Tavantzises are sole owners and principals of not only New Age, but also Multi-Juice and Snapple Hellas, S.A. Orr Mistic Ex. 1 ¶¶ 8-10; Ex. 5 at 47:10-21, 48:24-50:15; Ex. 8 at 97:5-12.

14. Prior to the New Age Distribution Agreement, Hellas was engaged in the business of importing and distributing Snapple brand beverages in Greece. Orr Mistic Ex. 1 ¶ 8; Ex. 5 at 47.

15. On or about February 23, 1996, Hellas brought suit against Snapple and its then-owner, the Quaker Oats Company in the U.S. District Court for the S.D.N.Y. (Case No. 96 CV 1371), claiming wrongful termination and breach of contract. Orr Mistic Ex. 1 ¶¶ 8, 18; Ex. 12.

16. On or about May 22, 1997, Triarc acquired Snapple from Quaker Oats. Orr Mistic Ex. 1 ¶ 13; Ex. 6.

17. The Hellas Action was settled on or about August 11, 1997, pursuant to a settlement agreement between Snapple (under Triarc ownership), Quaker Oats, and Hellas. Orr Mistic Ex. 12.

18. The Hellas Settlement Agreement provides, *inter alia*, that:

> Hellas and Snapple shall negotiate in good faith towards entering into a 3-5 year written agreement under which Snapple would convey to Hellas the exclusive right during the term of that agreement to distribute Snapple beverages in Greece.

Id. ¶ 4.

19. There are no references to either Mistic or New Age in the Hellas Settlement Agreement. Orr Mistic Ex. 12.

20. The Hellas Settlement Agreement contains an integration clause, providing that "[t]his Agreement constitutes the entire agreement and understanding between the parties hereto with respect to the subject matter contained herein."

Id. ¶ 13.

21. The Hellas Settlement Agreement also contains a choice of law clause, providing that it "shall be governed by the substantive law . . . of the State of New York."

Id. ¶ 11.

22. After the Hellas Settlement Agreement, Snapple and the Tavantzises, on behalf of Multi-Juice, which had not yet been formed, negotiated and exchanged several drafts of a written distribution agreement. See, e.g., Orr Mistic Exs. 4, 7, 13-15, 17.

23. There are no references to either Mistic or New Age in (i) any of the correspondence between Snapple and the Tavantzises related to the negotiation of the distribution agreement, (ii) any of the drafts of the distribution agreement that Snapple and the Tavantzises exchanged, or (iii)

in the final distribution agreement that Snapple and the Tavantzises agreed

to in December of 1997. See, e.g., Orr Mistic Exs. 4, 13-15, 17.

24. Snapple and the Tavantzises agreed upon the following provision

contained in the Multi-Juice Distribution Agreement:

> DISTRIBUTOR shall not without SNAPPLE's prior agreement which
> shall not be unreasonably withheld, engage, directly or indirectly through
> a third person with whom or in which it has any interest, in the
> distribution, promotion, advertising, sale or solicitation of purchases or in
> any other way handling any goods competitive with products, including
> without limitation: bottled, canned or otherwise packed soft drinks, teas
> and juices other than the goods sold by DISTRIBUTOR as of the date first
> above written and which are listed in Exhibit 3 hereto.

> Orr Mistic Ex. 13 § 3.7.

## DISCUSSION

New Age argues that it has established by the deposition testimony of Arthur and

Naoum Tavantzis that New Age performed under and was prepared to distribute Mistic

products pursuant to the Mistic Distribution Agreement. Memorandum of Law in

Support of Plaintiff New Age's Motion for Summary Judgment ("Plaintiff New Age's

Mem.") at 5.

New Age relies on Naoum Tavantzis' testimony that he was engaged in

discussions with Mistic concerning how Mistic and New Age were going to distribute

Mistic in Greece at the time that Triarc bought Snapple in early 1997. Gray New Age

Ex. 4 at 114. Mr. Tavantzis also testified that Donna Bimbo then told the Tavantzises

that if they settled the Quaker litigation, they would be able to distribute both Snapple

and Mistic and would have the "best of both worlds." Id. at 113; Plaintiff New Age's

Mem. at 3.

New Age then states that Naoum Tavantzis testified that he "ran to Greece after the [Quaker] case was settled on a handshake and I went and started selling Snapple before we even had any agreements written," Gray New Age Ex. 4 at 121, and that he went to Greece in reliance on Donna Bimbo's promises: "I am going to go back to Greece again and not only am I going to sell Snapple, I am going to sell Mistic too, so I get the best of both worlds" and that "nobody will have my Snapple in Greece or my Mistic, that you are the distributor . . . ." Id. at 128-29; Plaintiff New Age's Mem. at 5.

New Age argues that based on Naoum Tavantzis' understanding that he had exclusive distributorships for both Mistic and Snapple, he incorporated Multi-Juice,[18] spent money establishing a warehouse and an office within the warehouse, and bought computers and seven vehicles. Gray New Age Ex. 4 at 220-21. In addition, Multi-Juice's total outlays in connection with establishing and operating the Tavantzis' beverage distribution business in Greece after entering the Mistic Distribution Agreement equaled approximately $400,000. Id. at 224, Plaintiff New Age's Mem. at 6.

New Age goes on to cite the testimony of Arthur Tavantzis that he and Naoum formed New Age to enter into the Mistic Distribution Agreement, Gray New Age Ex. 5 at 195, and that he was all set to distribute Mistic products in Greece and Ms. Bimbo was well aware of that. Gray New Age Ex. 5 at 200; Plaintiff New Age's Mem. at 6.

New Age then notes that it never distributed Mistic because before it did so, Triarc acquired Snapple and expressed a preference to move forward with distribution of Snapple rather than Mistic in Greece. Id. Arthur Tavantzis testified, "[w]e were supposed to start distributing Mistic and then Triarc, who owns Snapple, told us we are

---

[18] Multi-Juice was incorporated well after the Hellas Settlement Agreement because the Snapple draft distribution agreements refer to it as a corporation to be formed. See Orr Exs. 10-12.

not going to do Mistic, we just bought Snapple, so we are going to go right into the Snapple, so there is no need to bring Mistic into the country." Id. at 197; Plaintiff New Age's Mem. at 6.

Based solely on these facts, New Age argues that it has established that it was ready, willing, and able to distribute products pursuant to the Mistic Distribution Agreement. Plaintiff New Age's Mem. at 7. Plaintiff cites Minuteman Press Intern., Inc. v. Matthews, 232 F. Supp. 2d 11, 14 (E.D.N.Y. 2002), which only stands for the proposition that reliance on deposition testimony to demonstrate performance under a contract is permissible, and Campoverde v. Sony Pictures Entertainment, 2002 WL 31163804 at *8 (S.D.N.Y. 2002), which stands for the proposition that a court will not grant a motion to dismiss when the Complaint alleges that plaintiffs showed up on the day called for in the contract.[19] Plaintiff New Age's Mem. at 7. Neither of these cases are dispositive in the instant case.

Here, New Age's performance as cited in its Memorandum of Law is disputed by Defendant Mistic, which points out that Naoum Tavantzis was present in May of 1997 when Donna Bimbo informed the Tavantzises of the plan to launch Snapple and not Mistic. Naoum Tavantzis testified as follows:

> [A]ctually, Mistic wasn't sold, Mistic purchased, and then I didn't mind, because I seen Donna move my product Mistic to the back label and was offering my Snapple back, so to me, there's two products in the store, I would rather have the Snapple, and that's what happened, you know, so we put Mistic on the back burner, she did, Donna, she said 'We are not going to launch it,' and I said 'Fine, I don't have a problem with it.'

Orr Mistic Ex. 8 at 146:18-147:3.

---

[19] Campoverde involved persons who showed up to appear in a television program pursuant to a written agreement and were prevented from appearing on the program unless they agreed to additional terms being added to the contract by the defendant. 2002 WL 31163804 at *8.

Accordingly, when Naoum Tavantzis went to Greece after the terms of the Hellas Settlement were reached, a genuine issue of material fact is presented as to whether he was well aware that he would not distribute Mistic and would be distributing Snapple and that accordingly any funds expended by him would not be for the distribution of Mistic. In fact, Naoum Tavantzis testified that all the money and the $400,000 in merchandise and credit he received in the Hellas Settlement was put into Multi-Juice (and not other companies owned by him) for the warehouse, the computer set-up, the cars and trucks, and office supplies. Id. at 117, 220-221. Furthermore, Arthur Tavantzis testified that New Age never hired any personnel, established a location, did any business, or placed any orders for Mistic products. Orr Ex. 5 at 104, 204.

Thus, Mistic has raised genuine issues of material fact as to the accuracy of the above statements of fact relied on by New Age in its brief to show it was ready, willing, and able to perform the Mistic Distribution Agreement.

Mistic also asserts that there is sufficient evidence that New Age abandoned the Mistic Distribution Agreement as of August 1997, pointing out that: (1) the Tavantzises did not preserve their distribution rights to Mistic products by such a provision in the Hellas Settlement Agreement, Orr Mistic Ex. 12; (2) throughout the correspondence and negotiations with Snapple on the Multi-Juice Agreement, the Tavantzises never brought up Mistic even though the drafts of the Multi-Juice Distribution Agreement contained a provision expressly prohibiting the Tavantzises from distributing competing products in Greece, Orr Mistic Exs. 13-15; and (3) although the New Age Distribution agreement prohibited the distribution of competing products and required New Age and its

principals to certify that none of its family members and relatives have any connection with persons doing business with Snapple Beverages in the country of Greece, Orr Mistic Ex. 13 §§ 3.7, 3.11, the Tavantzises never sought to obtain a waiver of these provisions. Abandonment does constitute a defense to a breach of contract claim. See Jones v. Hirschfeld, 348 F. Supp. 2d 50, 61 (S.D.N.Y. 2004); Klopfenstein v. Pargeter, 597 F.2d 150 (9th Cir. 1979) (granting motion for summary judgment based on the defense of abandonment).

Since the evidence cited by Mistic does tend to support Mistic's abandonment claim and Naoum Tavantzis' testimony suggests there was mutual assent not to proceed with the Mistic Distribution Agreement, a genuine issue of material fact has been raised, and the New Age Motion for Summary Judgment must also be denied on this ground.


**CONCLUSION**

For the foregoing reasons, Plaintiffs' First Cause of Action for breach of the distribution agreement between Snapple and Multi-Juice and Plaintiffs' Fourth Cause of Action for breach of the Hellas Settlement Agreement are dismissed. Summary judgment is granted as to Defendant Snapple's counterclaim against Multi-Juice based on the U.C.C. for goods sold and delivered but denied as to Defendants' motion for summary judgment for breach of contract and attorneys' fees. In addition, Plaintiff New Age's motion for summary judgment against Mistic is denied because a genuine issue of material fact was raised as to New Age's being ready and willing to perform and because of Mistic's citation to evidence of New Age's abandonment of the contract.

IT IS SO ORDERED.

Dated: New York, New York
June 1, 2006

Robert P. Patterson, Jr.
U.S.D.J.

Copies of this Opinion and Order sent to:

Counsel for Plaintiffs/Counterclaim Defendants

Law Office of Christopher J. Gray, P.C.
460 Park Avenue, 21st Floor
New York, NY 10022
By: Christopher J. Gray
Tel: 212-838-3221
Fax: 212-937-3139


Counsel for Defendants/Counterclaim Plaintiffs

Mayer, Brown, Rowe and Maw
1675 Broadway
New York, NY 10019
By: Dennis P. Orr
Tel: 212-506-2690
Fax: 212-849-5690